May it please the court. My name is Paul Taylor and I represent the appellant, Abboud McDonalds. I'd like to reserve five minutes for rebuttal. And before I go any further, I want to thank the court on behalf of the Abbouds for expediting this appeal. It's important to them. Thank you. You're welcome. This is an antitrust case against McDonalds. It was dismissed on summary judgment by the trial court. Viewing the evidence in the light most favorable to the Abbouds, McDonalds and its co-conspirators two franchisees rigged the bids in an auction of a dozen stores here in Seattle. Assuming that is all true, where is, I'm curious on the standing issue, where is the impact on the relevant market and what is the relevant market in your view? In a per se case involving bid rigging, number one, your honor, there's no requirement of proof of a relevant market. It is the basis for what is presumed to be injury to competition is presumed, and the relevant market inquiry is really designed to find out was there injury to competition? You were completely free to bid anything you wanted, right? Yes, we did. And then there's a contract that your clients are a party to that says that the right of first refusal is with McDonald's, the hamburger operation, right? Yes. And that's what they did. Yes, it is, your honor. Okay, what's the problem? The problem is it's a question of fact as to why they did it. And I think that's a problem because it's a question of fact, McDonald's argues they did it because they needed to protect the brand to make sure that the best operators, Mr. Comiskey and Mr. Cho, ran those stores. But the evidence is... Is that a business decision or is that a legal question? That is a question of fact as to whether it was a legitimate business decision or was it pursuant to the conspiracy. But why would McDonald's motivation be of any relevance to us here? Your client was free to bid this up as far as he wanted and really sock it to McDonald's and to make them exercise their right of first refusal. And as long as they have that right of first refusal, it doesn't matter what their motivation is, does it? If I have a right of first refusal in buying your house, do you have to ask me why I'm doing this? If I'm colluding with your neighbors? Yes, your honor, and if in fact you are colluding with my neighbors, you have violated the antitrust laws. There are many legitimate acts... You don't violate the antitrust laws, but if you enter into a conspiracy to rig bids, and as a part of that conspiracy, you end up excluding a competitor who actually won the bid, and you exercise the right of first refusal to finish the conspiracy, that's a violation of the antitrust laws. Do all franchisees directly compete with McDonald's, the franchise store? Depends on the setting, your honor. When stores are put up for sale, the answer is yes. Do they compete in the market for selling hamburgers and cheeseburgers and the like? No. But in this market, the secondary market for buying franchises, they do compete. Let me come back, though, to Judge Tallman's question, which is injury to competition. What's the injury to the relevant market? Number one, it's presumed, conclusively presumed, with a per se violation. But second, there was injury to competition in this instance. Number one, there was a reduction in the level of competitive bidding. Comiskey, Cho, and McDonald's all agreed not to sit... How do we square that, though, with the fact that a record price was obtained by the Hanson estate, or the Schultz estate, for the sale of these 12 stores? That just means that the conspiracy wasn't as successful as it might otherwise have been. And recall... Okay. Recall that the Abbouds were solicited to join the conspiracy. Cody teats to the Abbouds before the bidding. You can bid so long as you agree not to start a bidding war. The fact that a conspiracy is not as successful as it might not otherwise have been is no defense to an antitrust conspiracy. I understand the proof here, and even Mr. Leffler, your expert, as I understand it, acknowledged it. There was no impact on competition in the sense that because the highest price historically received was received in the Pacific Northwest, you can't show an impact on competition. Respectfully, your honor, at excerpt of record 577 and 578, Professor Leffler explains there was injury to competition because there was a misallocation of resources. When you have a competitive bidding environment, an option... Because the Schultz estate got too much from McDonald's? No, because the most efficient operator did not end up owning the stores. A winning bidder is the one who believes he can extract the most resources from those stores. In this instance, when you interfere with the free market process and you substitute less efficient bidders, that's injury to competition. And in fact, that creates injury to interbrand competition. When you're using the word efficiency, are you talking about quality of operation? No, I'm talking about efficiency... Perfectly legitimate. It is. To have the highest quality burgers in the market. No disagreement. And to have well-trained managers. No disagreement. And your firm did not have the well-trained managers that McDonald's was looking for, right? Respectfully, I disagree. We were deemed eligible to bid. That means we met their standards. For 12 new stores? For at least five. There was no restriction, ultimately, on our bids as to whether we could bid for two, five, or a dozen. But what happened here as a result of this conspiracy, the stores were taken away from what the market identified as the best operator and put in the hands of a less efficient operator. You say the market identified it, but the evidence is that McDonald's, which has to approve the acquisition, had serious reservations about the Abud's ability to operate more than a couple of more stores than what they already had. That's a question of disputed fact. And let me tell you why. On the one hand, you have them saying the Abud's are poor operators. On the other hand, you have the Abud's being the leader in many of the statistical categories tracked by McDonald's. Next, they say they wanted Comiskey and Cho in there to run these stores because they were better operators. Recall that Mr. Cho had been told by Cody Teats, you're in trouble. You have not submitted your financial statements for nearly a year. If you do not submit your financial statements to us in a timely fashion, you will not be allowed to bid. He did not submit those financial statements. Ms. Teats concealed that fact from her superiors as a part of the conspiracy. Had her superiors known, Mr. Cho would not have been allowed to get those stores because he was out of compliance with the franchising regulations. But I thought, okay, you're talking about not complying with the regulations with regard to financial information. I think the question was with regard to the efficiency and the quality of the operations. And you do concede, do you not, that there were deficiencies on the part of the Abud's in not having a sufficient number of trained managers who were graduates of Hamburger University? No, I do not concede that fact because as of July 2nd, we were made eligible to bid, which means by definition we satisfied all the criteria. So you called a bunch of people to Hamburger University in order to get them qualified, is that what happened? No, there's an issue here is that the franchising agreement is actually silent as to whether the Abud's themselves as Hamburger University graduates can be deemed part of the team of graduates you need. They took the position in the franchise agreement is silent that they did not need additional managers at that time. But in any event, McDonald's was satisfied that the Abud's met the criteria by July 2nd. Let me turn now to the issue where the trial court first went awry, and that's the issue of so-called intra-enterprise conspiracy. The trial court appeared to hold that as a matter of law, McDonald's and its franchisees can't conspire under what's called the intra-enterprise exception to Section 1 liability. What does that hold? That says that if the alleged conspirators are really a single entity, such as a parent and a wholly owned subsidiary, they can't conspire to violate the antitrust laws because the agreement does not reduce competition because those parties did not compete against each other in the first instance. So there's no net loss to competition. The trial court, though, in reaching that conclusion, neither cited nor applied the controlling test in this circuit, which is Jack Russell Terrier. In Jack Russell, the court held that in order to qualify for that exception, you need to meet two criteria. First, you have to show that you are neither actual nor potential competitors. Here we know that McDonald's, Comiskey, and Cho were at least potential, if not actual, competitors. They were there bidding. They could have bid against each other. They agreed not to bid against each other. First test or first element of the Jack Russell Terrier case is not satisfied. Full stop. Exception doesn't apply. But let's assume that they weren't actual or potential competitors, even though they were. Can McDonald's satisfy the second required element, which is economic unity? The answer is no. Why do I say that? The first way to show it is by common ownership. You don't have common ownership here. Second, fiduciary. You have a fiduciary relationship such that one is acting on behalf of the other, in which case you really have only one actor. That doesn't apply here. Third, the third way of showing economic unity is, was there an agreement to share profits and losses? If there is, there's a congruence or an alignment of interest, and it wouldn't matter who ended up with the stores because they'd all get the profits or they'd all share the losses. In this instance, though, it did matter who ended up with the stores because there was not the agreement to share profits and losses. The trial court relied on the Williams case out of the District of Nevada, which was a jack-in-the-box case. Williams is kind of a unique decision. Some might say quirky. It's been described that way. But you don't need to overrule Williams to reverse the trial court here today, and let me explain why. Number one, Williams predated the Jack Russell Terrier case by more than a decade. Number two, Williams says you look at the facts on a case-by-case basis. And number three, Williams noted that in that case, the cornerstone of Section 1 liability, competition between the defendant entities didn't exist. Here, we have competition between the defendants, or between McDonald and his co-conspirators, to purchase these stores. What does McDonald say? McDonald says it's a matter of law that it, as a franchisor, and its franchisees cannot conspire to violate the antitrust laws. Carry that argument out. The literature says that turns antitrust law on its head, and it has radical implications. And it does. Let me give you one example. Were this court to hold that franchisors and franchisees cannot conspire, it would legalize vertical price-fixing between franchisors and franchisees. And we all know, and it's been the law for 100 years, that that's not legal. In fact, it's per se illegal. The Copperweld Inter-Enterprise Exception does not apply. Let me turn now, in my remaining time, to the question of whether bid rigging is per se illegal, or is it, as McDonald's argues in this case, subject to a rule of reason. Bid rigging, for decades, has been per se illegal. McDonald's argues here, though, that it's not per se illegal because they were acting in the best interest of the brand, getting the best operators in there. That's the argument. But if you listen carefully to the argument, that really collapses down into a question of fact. Was the exercise of the right of first refusal done to get the best operator in, or was it done pursuant to an in furtherance of the conspiracy? So is your argument, Mr. Taylor, that McDonald's may well have a right of first refusal under its standard franchise agreement, but it cannot exercise its contractual right for an improper purpose? Yes, Your Honor. And what is that, a breach of the implied covenant of good faith and fair dealing under Washington law? Well, it's a breach of the antitrust laws, to begin with, if they do it pursuant to an antitrust conspiracy. But the core of this, the notion that they had to rig the bids, remember Mr. Kajawa's testimony. He's the national vice president of franchising for McDonald's. And he said, he didn't say we need to do this to advance the brand. His testimony was, we don't need to do this. We don't enter into agreements with our franchisees, and it is not necessary for the system to operate. There again, that raises a question of fact as to whether the exercise of the right was done conspiracy, good faith business judgment. Is he saying that McDonald's could make these decisions unilaterally? McDonald's could make a unilateral decision, yes. A unilateral decision that every franchisor would have to give the override right to McDonald's to buy the franchise, to override the highest bid and take it at the highest bid? McDonald's only right under the franchise agreement is that it cannot unreasonably withhold consent to the proposed transferee. That's its sole right. Or it can exercise. It does not have a right of first refusal at the high bid? It can also exercise a right of first refusal. That's another right. Yes. Okay. I apologize, Your Honor, if I was confusing. When McDonald's argues this morning that bid rigging is subject to the rule of reason, listen carefully to see if they cite a single case in the history of the antitrust laws that says that, that bid rigging is not per se illegal. I submit to you that they will not and they cannot because that is not the law. But this is a little different from the typical bid rigging case. This is not a bunch of logging contractors getting together to agree that they're going to put the screws to the Forest Service and they're only going to bid a certain amount of money. Your client had full control over the bidding, did it not? They could run the bid up to $10 million a store in order to make McDonald's exercise its right of first refusal at $10 million. Two responses. Number one, Your Honor, is describing the Portak case. This case is on all fours with Portak. I'll address that in a minute. But number two, when a conspiracy is in place, it doesn't matter what my client ran it up to, he didn't get the stores because of the conspiracy. But let's come back to Portak. But it didn't have anything to do with the bidding. It had everything to do with McDonald's exercising its right of first refusal to simply step in and take the store. And if it was done for legitimate business purposes, there's no violation of the antitrust laws. If it was a step in furtherance of the conspiracy, that's the Portak case. But the problem I'm having, Mr. Taylor, is that it's not a traditional bid rigging in the sense of, in my hypothetical, the timber sale. The Forest Service is the victim. And the impact on competition in that case is the Forest Service would have received a much higher bid if free market forces had been at play and all of the legitimate bidders had not conspired with one another to bid the timber sale up to whatever the economists would call the pure market price. Here, your client is in control of the bid. He can run that bid up as far as he wants and force McDonald's to then pay that amount of money in order to exercise what you say is, for improper reason, its right of first refusal to take the store. But it still has to pay whatever the price was that Abu's bid. Agreed, Your Honor. But that's only one component. Price to the estate is only one aspect of the injury to competition. Well, but then we're sort of getting back to my first question is, what's the relevant market here and what's the effect on competition? And I'm still struggling with the analysis that you're urging on us. Well, the relevant market in a bid rigging conspiracy is the items that are up for auction. By definition, it's a self-defining market. Franchise. Yes, the franchise. You get it or you don't. And the franchise rules are all – none of them are going to be changed by reason of this bidding process. That's also correct, Your Honor. The way they were changed, though, was by virtue of a conspiracy. That's a question of fact for the jury to decide. But coming back, Your Honor, Judge Tallmonteer – Everybody that held a franchise held it under the standard franchise contract with McDonald's, right? Yes. So that's the agreement inter-party relationship, isn't it? Yes. Okay. Coming back to Your Honor's question, Judge Tallmont, the injury to competition, you have multiple injuries in this instance. You have the hypothetical injury to the estate. No one knows what the price would have been but for the agreement. That's a matter of pure speculation. They got a high price, you bid. Now, wait a second, Mr. Taylor. A Boots could pick whatever price it wanted to bid. That didn't have anything to do with whatever the alleged conspiracy was between McDonald's, Cho, and Comiskey as to who would bid or what their bids might be. I agree. So I'm still having a hard – it seems like we're talking apples and oranges in terms of bid-rigging law here, and I'm having a hard time – what I hear you saying is they couldn't do it because it was per se illegal. Because the conspiracy existed, whatever they did is illegal, and that's enough. We don't have to show an impact on competition. So we don't really care what the relevant market is. Well, two responses, Your Honor. In fact, in a per se violation of the antitrust laws, injury to competition is conclusively presumed. It has been since the Coney vacuum oil back in 1940. You don't reach the question of injury to competition, but if you do – I would agree with you if you go back to my Forest Service timber contract. You don't have to necessarily show what the fair market price would have been in the absence of the conspiracy. We presume that the Forest Service was harmed by the fact that a bid-rigging conspiracy among the bidders existed. But that hypothetical doesn't include the fact that the winning bidder, in this case, Aboods, was free – because he was not a member of the conspiracy – was free to bid up the price as high as he wanted. And if McDonald's wanted to exercise its right of first refusal, it had to pay that amount under the terms of the franchise agreement. Under Your Honor's hypothetical, let's take the bidding out of the Forest Service. There's three bidders. They get together. They rig the bids. And on the morning of the bid, a fourth bidder shows up, wins the auction. Does that mean the three bidders have not conspired in violation of the antitrust laws? Plainly no. Let's take your – In that case, what's the impact on competition? The Forest Service got a higher price than what the bidders had agreed to bid. The fact that a high price was or was not received does not change the outcome that there was less competition than there would have been because they agreed not to bid against each other. You mean it should have been a higher price for the bid? We don't know the answer to that because of the agreement. The real problem is that McDonald's has decided in advance where it wants to allocate these franchises. But it has a right of first refusal. It's going to be able to direct this no matter who comes in. So we can have outside bidders, people who aren't even a part of the Seattle market that are unknown, except to the McDonald's headquarters, right, that can come in and bid on this thing. And if McDonald's has previously decided that it wants somebody else to get it, they're going to be able to do this. That's perhaps why they have this right of first refusal in the first place. But that's not the complete facts in this case. Let me explain why, Your Honor. Which is we know, viewing the evidence of the light most favorable, if we go to Cody Teet's diary, we know why this was done, to reduce prices. The entry in the diary before the bidding starts, risky to have Cho and Kaminsky negotiate, could ask for more stores and offer higher prices. Well, that may well be, but it may just be bad economics on the part of the author of the diary. That's a question of fact for the jury to decide, not for Judge Peckman, not for this court. There is evidence from which, under Rule 56, you'd boast favorably that- Counsel, let's go back to the Forest Service. If we've got the three bidders who decide to rig the bid and we have a fourth bidder who comes in and wins the bid, have you got an antitrust action against the other three? Yes, in fact, it's a per se criminal offense. Once the agreement is reached- Is there a civil relief for it? The Forest Service, if it felt that their actions, that the conspiracy among the three had depressed the price, yes, there's a civil action by them. Would the winning bidder have a claim against the other three? No, because the winning bidder, in your scenario, got the logs, got the asset. But let me finish with Portak, because it's pretty close to this date. What if the government terminated the contract for the convenience of the government after the bid was awarded to the fourth bidder? That's a different scenario. Well, would the-I'm trying to draw an analogy here to what happened to Abu. They won the bid, but they didn't get the logs. Yes. Okay. In that situation, does the fourth bidder have an antitrust action against the three colluders? No, because those colluders were not the cause of him not getting the logs. It was the government. Okay. Then let's hear from the other side. You're over time, Mr. Taylor. Thank you. Good morning, Your Honors. I'm Dan Swanson. I'm representing the defendant, Finatelli McDonalds, here this morning. I have prepared an absolutely brilliant summary of the facts of the case. You've been to Hamburger University. Well, you know, I'm beginning to wonder if perhaps I haven't been through that already. I think McDonalds used to make all of its lawyers go to Hamburger University. Did they stop that practice? It depends on whether or not I win the case. It may be in your hands. Okay. But you're going to have to take my word that the summary was brilliant, because it's obvious the panel is familiar with the facts of the case already, so I'm going to skip over that. All of the points that Mr. Taylor has made and made ably are points that were carefully considered by Judge Peckman in the summary judgment proceedings below. She rejected those points. She looked at the record. She had it in front of her. We think there's no reason to reverse her decision on the part of this Court. But we reviewed it de novo, did we not, Mr. Swanson? You certainly – it's a summary judgment, and the Court reviews it de novo. I mean, we have great respect for Judge Peckman, but we have to give her no deference on this issue, correct? That is correct.  That is correct. So tell us why she was right. All right. Well, Judge Peckman pointed out in her decision that there were several independent reasons for granting summary judgment in this case, and first and foremost among them was the issue of standing, the point that has already been discussed by Mr. Taylor. What's your response to his argument to my question that it doesn't really matter what the impact on the market was, however you define it? It's a per se violation, and that's all we need. Well, if Mr. Taylor were here prosecuting a criminal case, I suppose he might have an argument. He's here pressing a case on behalf of this client under Section 4 of the Clayton Act. Section 4 of the Clayton Act requires, as the Supreme Court has told us and this circuit certainly has told us, antitrust injury. Judge Beezer wrote one of the very notable cases of the last decade in rubble oil, elucidating that point in a different context in a predatory pricing case. But he does need to show that. The Supreme Court has told us that even in a case of horizontal price fixing, bid rigging, you name it, antitrust injury must be shown. The Supreme Court said that in the ARCO decision at page 344. It's cited to footnote 7 in Matsushita, and at that point is, I think, beyond argument. The type of injury that flows from a bid rigging case is a reduction. In this context, there's a reduction in the price of the Schultz franchises. That is the one thing that the plaintiff agrees didn't happen here, and that's also the one thing that the Schultz estate itself, as represented by Mr. Hanson, testified, in the record below, did not happen. In fact, the estate was ecstatic with the price,  Even if the estate was wrong, that would not give standing to the plaintiff here to bring a case. If the estate was wrong, it would be the estate that would be the direct victim and that would have the right to sue under the antitrust laws to bring that claim under Section 4. And, of course, the estate did not do so, did not believe, in fact, that there had been injury or a violation. And it's certainly black-letter law that the plaintiff here would not have standing to bring that claim because, as has been brought out, the plaintiff is benefited, not harmed, when others in a bidding situation decide to pull their punches and decide to bid lower amounts. The plaintiff should start singing happy days are here again when that situation comes about because that is only to its benefit. Now, here, what the claim of injury is traces to not bid rigging, but exercise of a right of first refusal. And what is required, there is no presumption that exercise of rights of first refusal under the antitrust law cause anti-competitive effects, either usually or even in any conceivable circumstance. What the plaintiff needs to show and what the record is completely barren of in this case is some type of indicator of what is typically taken to be anti-competitive effects. There is, in this case, no evidence of any impact on price. There is, in this case, no evidence of any restriction of output. There is no evidence of any adverse effect on consumers. In the interbrand market, which the Supreme Court has told us again and again is the most relevant and significant market for purposes of the antitrust laws, there's been no effect whatsoever. The plaintiff concedes that. The plaintiff even says, don't pay attention to the market for burger and fries. It's not relevant. And that's the market the Supreme Court tells us is the most relevant. But as usual, as we see in these cases, it always comes down to a fight over how you define the relevant market. And their definition of the relevant market is the secondary market among franchisees who are bidding on available stores. What's your response to that? I will say a couple of things in response to that. One is, even in their own artificially defined relevant market where the Schultz store is up for auction, there's no evidence of any anti-competitive effect. The exercise of the right of first refusal didn't affect the price. The price had already been set. It had been set by bidding in which the plaintiff participated. It didn't affect output. Those stores were already going to be transferred. That was a result of the unfortunate passing of Mr. Schultz. The only question was who was going to be the franchisee, who the stores were going to be transferred to. And this circuit and, frankly, all of the others for decades now have said in myriad cases that the identity of who the franchisee is, the identity of who the distributor is, is not a matter of concern for the antitrust laws. Every franchise termination case, every distributor transfer case is not an antitrust case because the argument is that this one is better than that one. The courts have rejected that argument, just as Kennedy rejected it when he was sitting on the Ninth Circuit. In the A.H. Cox case, the Ruttman case rejects that premise. The Seagram-Hawaiian Oak case rejects it. I could go on and on and on, listing cases that say that that's not antitrust injury. Now, the plaintiff here, it does, Your Honor, come down to the definition of the relevant market because a relevant market has to be defined when you don't have a per se claim. And what injures them here, what injures the plaintiff here, is not bid rigging, which would be per se unlawful. I'm not here to say bid rigging is not per se unlawful. What I'm here to say is they weren't injured by bid rigging. If there was bid rigging, they were helped by that. What they trace their injury to is the exercise of the right of first refusal. That didn't cause any effect that is associated with antitrust injury that wasn't connected to bid rigging. Their own expert, when asked in the deposition, how could the exercise of the right of first refusal further the alleged conspiracy in this case? I can't think of a way. So you don't have to take our word for it. Is McDonald's motivation, Mr. Taylor argued that McDonald's motivation in redistributing the franchise after it exercises its right of first refusal is relevant. Do you want to respond to that? Well, I think the answer is that what is relevant is whether or not the exercise of the right of first refusal caused some type of injury that qualifies as antitrust injury. This circuit and many others have said we don't look at intents when the question is what was the objective impact. If McDonald's is talking with its franchisees about how to allocate these franchises, and they cut the abuts out of that, they don't get to be a part of that. If McDonald's says don't worry, we're going to cover you, we're going to fix this so the outcome comes out correctly, that's not cognizable under the antitrust law? Well, if it's cognizable at all, it's certainly cognizable under the rule of reason, and that goes back to Judge Tolman's question about what the relevant market issue is here. You have to define a relevant market in a rule of reason case. You have to bring forward evidence of market concentration, which is not going to be forthcoming here. It's an incredibly competitive interbrand market, but you have to come forward with evidence of anti-competitive effects. You have to assess all the justifications. That's a rule of reason case. That's not a case that we see here. That's not a case that's in the record below. Plaintiff has essentially abandoned the baggage of a rule of reason case and proceeds based solely on the premise that they've got a per se case. And that, again, we would assert, at least since TTE Sylvania, the issue of a franchisor deciding who will have a franchise, who will have which territory, who will have which customers is decided under the rule of reason. It's not decided under the per se rule. And it does require a definition of a relevant market, and it does require all of the accoutrements of a rule of reason case, which they have disclaimed. And that is one reason why this decision can be upheld on that grounds alone. The Court need not reach the other issues. There are many ways, of course, to resolve and affirm this case without reaching all of the issues that it presents. I would say there has been some reference to, on the part of the plaintiff, to what their expert has said affirmatively about misallocation and the like. And what they're citing is a two-page sketch of a possible expert report that is in the record. But I would direct the Court's attention to the actual deposition of the expert after that report, or sketch of a report, was submitted. It appears, starting at pages 65 and 66 of the excerpts of record, where the expert essentially said, I haven't looked at this stuff yet. I haven't evaluated it. I haven't examined it. I'm not prepared to give an opinion at this point. And to top that off, at page 381 of the excerpts of record, there was a letter from the plaintiff, Mr. Taylor, stating outright that that expert was not going to be offered up at trial on the issue of antitrust injury. So even though what they're citing that expert for is a point that's contradicted by this Court's cases, the cases like A.H. Cox and Ruttman and Seagram's, that say identities of franchisees and distributors don't rise to the level of antitrust injury, that expert is still incapable of offering that opinion, does not have a foundation for that sketch of an opinion, a possible opinion, and it certainly can't serve to defeat summary judgment. Let me just address a word to the Big Bear and JTC cases, which are discussed in the plaintiff's papers. We certainly submit that the plaintiff misconceives the import of those cases, and they certainly don't ride to its rescue in this litigation. Those are cases where ongoing product market conspiracies were enforced by depriving plaintiffs of the ability to bid against the cartel, the conceded cartel in the case. Here McDonald's took affirmative steps to permit the plaintiff to bid, to make the plaintiff eligible. It accelerated the plaintiff's product annual review. It took on faith that the plaintiff was changing its ways, was sending its managers to Hamburger University, was going to be qualified at that next review on July 2nd, and on that basis allowed it to bid, told Mr. Hansen of the Schultz estate that it could bid, and the plaintiff did bid, and it set the price for those five franchises, and McDonald's paid it. So far from the fact pattern of a case like Big Bear, which talks about a very narrow exception to a very broad rule against standing that applies in a case like this, the facts are the exact opposite here. There was no exclusion of a party, a plaintiff here, from bidding. McDonald's actually acted to include the plaintiff and to enable the plaintiff to bid. Going back to the rule of reason versus per se issue. Well, let me back up, counsel. As I understand Mr. Taylor's argument, you have McDonald's. If there is a conspiracy, assuming that point, which there is some evidence, then what McDonald's has done is has assured people that they'll stay out of the bid, that it will fix everything at the end by exercising its right of first refusal, so that you may have franchisees who are interested in this franchise who will stay home from the auction because no matter how high it gets bid, McDonald's is going to exercise its right of first refusal and then reallocate the franchise. That's a little different than a conspiracy in which you've excluded the bidder. Here you've encouraged bidders to stay home because there's no reason to bid this thing up because McDonald's is going to fix it all in the end. Well, what the Supreme Court tells us in ARCO and Matsushita is a plaintiff can't kind of wave his hands and say everything is pursuant to a conspiracy and thereby surmount the antitrust injury requirement. You have to look at what the injuries are. And if one assumes, and we don't believe the record in this case supports that assumption, there was some impact on the pricing of the Schultz franchises, then the plaintiff that has standing to raise that antitrust injury is the Schultz estate. That doesn't transfer over to the plaintiff here. What the plaintiff here would be complaining about would be the fact that a franchisor had decided who would have which territory, who would have which franchise. And that injury, at least since GTE Sylvania, has been very clearly identified as something that has to be resolved under the rule of reason and clearly requires a showing of antitrust injury. And it's not enough in that case to say, well, look, someone else was injured by bid rigging. Here I am. I'm actually injured by a vertical restraint on deciding which franchisee gets which franchise, so I don't have to show antitrust injury. What the Supreme Court tells us is for that particular alleged injury, they do have to show antitrust injury. They do have to define a market. They do have to bring a rule of reason case, none of which are things that the plaintiff had done in this instance. We're reminded, I think, just a month or two ago of the fact that uttering the words price-fixing or bid rigging isn't enough in an antitrust case by the Supreme Court's decision in the Texaco versus Dager case where the plaintiff had alleged that certain conduct in the course of the formation and pricing activities of a joint venture were price-fixing. And a panel of this court accepted that view. The Supreme Court took the case and said, yes, price-fixing is a per se violation of the antitrust laws, but we look beyond labels and we look to see what the underlying conduct is. And here we see something that is not per se unlawful, and the plaintiff, if it wanted to make that a case, was required to bring a rule of reason challenge. And this plaintiff in the Dager case didn't do that. And so the Supreme Court reversed and said that they were out of the box legally, that they didn't have a claim, they didn't have a case. Here there has, although we hear again and again about bid rigging and the per se rule, the plaintiff has cited no case that is like this one. We have cited a case that is like this one and, in fact, goes beyond it, I think, and it's the Fifth Circuit's decision in the Kestenbaum case. We've actually cited the first decision. The Fifth Circuit actually reversed a verdict for a plaintiff after a jury trial and in the course of that decision held that a jury instruction had been given incorrectly when it directed the jury that a franchisor's fixing of the price of a franchise for transfer among franchisees was per se unlawful. The Circuit said that's not per se unlawful. A franchisor has a perfectly legitimate reason to be concerned about what the price is for transfers among its franchisees. If a transferee gets a franchise at a price that is far too high, it gets saddled with obligations it may not be able to labor under, and that can adversely affect the franchise system. So that is a decision that is adjudged under the rule of reason. There was a remand. We actually didn't cite, and I apologize for this, the Fifth Circuit's decision after that case came back. It is at 575 F. Second, 564, and in that case the Circuit was again confronted by a jury verdict for the plaintiff, and the court again reversed and it said you have tried this case under the rule of reason, and your theory was that the price of the franchise was forced down, and it was fixed by the franchisor so that the new franchisee could come in and engage in all kinds of anti-competitive violations of the antitrust law, but your showing of fact wasn't sufficient under the rule of reason. We remanded again. We have to go back and do it again. So we have a case that actually says that if McDonald's sat here and said, yes, we did set the price, which we didn't, that would be judged under the rule of reason under the authority of the Kestenbaum case, which follows at least second decision came after the GTE Sylvania case, and it certainly cites that, which we would cite to and have cited to as well. Let me just say a word about the copper weld issue. There is a great deal of dire warning in the plaintiff's brief and in the oral argument about what horrible consequences may flow from the application of copper weld in this case. The only thing we are here to urge the court to do is to apply the Williams precedent. It is a precedent of this court. Judge Peckman followed it. It has never been questioned. It has never been reversed. It has its vitality. I believe that the Jack Russell case was a very straightforward application of the principles in the Williams case, but our case is on all fours with the Williams case. The franchise system that was under review there is in all relevant legal attributes the same as the one that we have. The only difference is Jack in the Box had exclusive franchises, but the whole point was that the franchisees weren't in competition, and that is the case here. You've heard the plaintiff say that. Mr. Taylor said that just minutes ago. Now, what Mr. Taylor says is, well, no, no, no, there was competition for the franchises. Now, if that were the answer, then the Williams case would have been different because, of course, the issue there was a restriction on competition for employees. There is, of course, going to be competition at some point between any two entities. There's competition between two wholly owned subsidiaries and hiring employees and doing things that are secondary to the main occupation of that business entity in the interbrand market. But the point here is, and the point that was determinative in Williams, is that there's no competition in the market for burger and fries among those franchisees. There is a common interest. There is complete control. And the fact that prices are set differently is not a factor that disavails the defendants of the protections of copper wealth. That's exactly what the court said 12, 13 years ago in Williams. It hasn't unleashed a horde of antitrust crimes and depraved activities, as the plaintiff suggests. It's been on the book for a long, long time, and all we're saying is we fit that case and we're entitled to, and the district court judge believed that we were entitled to it, to its protections. Counsel, your brief and that of your opponent are filed under seal. I've looked at the docket sheet for this court, and I find no order of this court sealing anything, and I'm wondering why we're going to maintain a seal in effect. We've orally argued the matter completely here. It's available to the press, and the public has a right to know. The reason for filing the brief, as it was, was a consequence of the use of materials that were under seal before the district court. Obviously, Your Honor, we can ‑‑ Do you have any objection to this panel removing the seal at the court of appeals, and we'll worry about the district court later on? Might I confer with my client before I answer that question? I'd like to know, because I'm inclined to do it. We just decided a case over in Hawaii dealing with federal criminal matters and corruption in the police department, and the newspaper went after the police department. We just completely opened the books again on that case, which had a lot more reason to seal than I can see here. This is just a commercial case between private parties. If that's something perhaps we can confer on or report to the clerk, or if the court would like an answer now, obviously, I can confer. If you're prepared to give us a letter in the next five days that you and counsel agree, if not, I feel free, at least in my discussions with the panel, to vote to make it public. We understand, and we'll comply with that. It causes a practical problem for us because we have to issue a decision, which is obviously going to be fully available, either electronically in print or both. And we should have anticipated that, and I apologize for not having thought ahead on that point. We will address it in the manner that Judge Beezer suggests. I know I'm out of time. On the state law claims, we think those issues are well briefed. There's no issue of public interest here under the Washington Consumer Protection Act. There was no promise of a franchise, therefore, no breach of contract. And we certainly submit on the briefs on those points. Okay. Very well. Thank you. Mr. Taylor, I'll give you a couple of minutes in rebuttal. Thank you, Your Honor. Thank you. Direct the Court's attention to the JTC Petroleum case, 190 Fed 3rd, 775. That was a situation where you had three road pavers getting together and rigging bids. A fourth road paver came along. He wasn't a part of the conspiracy. He won the bid. The road pavers prevailed upon the asphalt supplier not to supply the winning bidder with asphalt to perform the job. Therefore, he couldn't execute on what he had won. Judge Posner looked at that and said, that excluded paver. The winning bidder has standing to challenge the bid rigging conspiracy. So there's a situation just as here. You have one victim, the state of, I believe it was Indiana, who was letting the contract. And you have another victim, the competitor who was excluded as a result of the conspiracy, even though he wasn't part of the conspiracy. That's our case. Second, addressing again Judge Tallman's question about relevant market, go back to Northern Pacific Railroad, Jeff's Jeanery. All the cases Supreme Court on down say when it's a per se violation. That is the end of the analysis. It's called the trump card. There is no necessity to go into an inquiry as to the relevant market. And finally, the Falstaff case, which was cited and relied upon by the defendants, has an interesting outcome. They sent it back to the jury on the question of was setting of the price done in good faith or was it done for an anti-competitive reason? They said that was a jury question. That's our case here. It's a jury question as to whether McDonald's exercised the right of first refusal as a part of the conspiracy or in the exercise of good faith business judgment. That's a matter reserved for the jury. Thank you. Thank you very much. Counsel, the case was well argued. We appreciate the arguments. We'll get you an answer as soon as we can, and it is submitted. We are adjourned until tomorrow morning.
judges: Beezer, Tallman, Bybee